Welch, J.
Winpenny was a manufacturer of blankets, residing in Philadelphia, and French a broker for negotiating army con'jtracts, residing in Cincinnati. On the 24th of September, 1864, ■Winpenny authorized and instructed French to make a contract for him with the quartermaster at Cincinnati for “30,000 blankets, at $1.30 per pound, to be delivered at the rate of 6,000 per month, after thirty days’ notice of award of the contract.” On the 4th of November French procured the award of a contract conformably to the instructions, except that it required the 'delivery of the blan*kets to commence twenty instead of thirty days after the notice of *473 •the award; and also gave his personal written guaranty, agreeably to the usage of .the department, for its execution. Winpenny was immediately informed of the award of the contract, and furnished with a blank form to be executed by him, with sureties. He at once informed French that as the contract was not as he required it, he considered it at “ an end,” but was willing to make a new contract at $1.40 per pound. Sixteen days subsequently, and without in the meantime having signified to the quartermaster any intention to disaffirm the contract, and without receiving any intimation from the latter that it was rescinded or superseded, Winpenny came to ■Cincinnati, and applied to the quartermaster for a modification of the contract, as follows:
“Cincinnati, November 22, 1864.
“ Gol W. W. McEim, G. Q. M. U. S. A.:
“ I, J. W. Winpenny, of Philadelphia, have come to ask from you the favor of granting to me an extension of thirty days’ time on a ■certain contract for 30,000 army blankets. My reason for asking this indulgence is in consequence of a misunderstanding between Mr. French, my representative, and myself; and in consequence of .■said misunderstanding, I am in reality left in position that I could not now enter into the contract with any hope of complying with it, without getting the extension asked for.
(Signed,) “ J. W. Winpenny.”
*To this note the quartermaster replied : “ The time on [473 your contract will be extended as you request.” A formal written ■contract was executed accordingly, under which Winpenny subsequently delivered the blankets, and received his pay from the government, amounting in all to $195,000.
From the evidence it appears that the negotiation by French with the department was a bona fide business transaction, and that no improper influences were used, nor any dishonorable means resorted to, in procuring the contract, he and the quartermaster apparently treating each other as adversary in interest, and in nowise acting in concert.
The evidence also shows that it was customary in such cases to allow the agent a commission of from two to two and a half per cent, on the amount of the contract.
To recover this commission, amounting as claimed to $4,875, French brought his action against Winpenny in the Superior Court of Cincinnati, where he recovered a judgment for $1,894.70.
*474 The defense set np by Winpenny is twofold: 1. The blankets' were not delivered under the contract negotiated by French, but under a new contract made by Winpenny in person ; 2. The procuring of such contract by an agent is against public policy, and' no compensation can be recovered therefor.
The cause was submitted to the court, and on the trial a bill of exceptions was taken, which sets forth all the evidence, substantially as above recited, and shows the overruling by the court of a-motion made by Winpenny for a now trial on the ground that the-finding of the court was contrary to the law and evidence.
The judgment was affirmed by the Superior Court in general term, the only question raised by the assignment of errors in that court being, as it is here, whether these facts warranted the finding and judgment of the court in the original action.
We answer that question in the affirmative.
The first defense was not true in fact. The blankets were delivered upon French’s contract, although in a modified form, and not upon a new and independent contract. .The technical rule of common-law pleading, by which the slightest alteration in a contract 474] makes it another contract, is *a mere fiction of pleading, and can not safely be applied to matters of common business and com ■ m'on parlance. There was but one contract hero, and that was the-contract negotiated by French. It is impossible to read the correspondence between Winpenny and McKim without coming to-this conclusion.
The words “ extension,” “ favor,” “ indulgence,” “ asked for,” and the like, could never have found a place in Winpenny’s note ; nor-could the words “ your contract,” in the quartermaster’s reply, have-been received .and acted upon without objection by Winpenny, if it be true that he came to Cincinnati to negotiate for a contract denovo, and to protest that he had never made one. He evidently came there intending to build upon the foundation laid by French, and not to run the risk of- competition from others, which ho must run in bidding'anew. There seems too much reason to suspect that-his real purpose was to steer so nicely between repudiation and confirmation of the contract that he might reap its benefits without subjecting himself to its burden. Wo must remember that when Winpenny was at Cincinnati, the question whether he would be-bound by the contract of French, was a question between Win-penny and the quartermaster, and not between Winpenny and. *475 French. Had Winpenny then told the quartermaster, what he tells French now, that he repudiated the contract, non constat that the quartermaster would not gladly have sot it aside, on the ground that he could then obtain more favorable terms from others. Instead of this, Winpenny, in effect, says to the quartermaster, “ it is my contract, but I ask, as an indulgence, that you make it more favorable to me.” By that means he obtained all the benefits of the contract with the superadded “ favor,” and, as it seems now, with the intention, by the use of a legal fiction, to avoid the payment of any commission. This would be a very handsome piece of diplomacy, if it only had the element of fairness. We are inclined to think that element is wanting. The plain truth of the matter is, that Winpenny first affirmed the contract, and then obtained its modification. By adopting it in part, ho adopted it in whole. Story’s Agency, sec. 253. By adopting it as to McKim, he adopted it as to French, and became liable to him *(in the language [475 of the author, sec. 244) “ for the same compensation as if he had been acting within the scope of an acknowledged original authority.” It seems to us, therefore, that the court did not err in overruling the first defense.
The second defense — the illegality of the transaction — not having been specially set up in the pleadings, nor insisted upon at the trial, a question' is raised whether it can now be noticed by the court. Without considering this question, it is enough to say that, in our judgment, no case of illegal consideration is shown by the evidence. We know of no law forbidding the employment of agents to negotiate contracts with the government. It is an employment which is, in many cases, peculiarly liable to abuse, and which, therefore, should be narrowly watched, but it is not necessarily illegal or against public policy. If fairly and honestly conducted, it is in harmony with the public interest, and of benefit to both contracting parties. In many cases such agents are indispensable to the contractor, on account of his absence or incompotency to transact the business. In such cases they' are of benefit to the government also, by increasing the number of competitors for its contracts, and by enabling its officials to dispatch public business without unnecessary delay and trouble.
The case of The Tool Co. v. Norris, 2 Wal. 45, is relied upon by counsel for plaintiff in error. It does not sustain them. That case was essentially different from the present, not only in the char *476 acter of the means resorted to by the agent — which counsel seem to argue is the only point of difference between the cases — but also in the nature of the contract of employment. Here there was a simple authorization to make a contract — a specified and well-defined contract. No contingent fee. No special agreement as to mode or amount of compensation. There was to be a public lotting to the lowest bidder, and Winpenny merely employed an agent to put in his bid, and, if you please, to guarantee his performance. French was not employed to “ procure” a contract, as a mere matter of personal “favor,” but to make the contract, as a matter of convenience and necessity. There is nothing in the nature of such an employment to require or suggest the use of improper influ476] enees, and none such seem *to have been resorted to by French. He seems to have acted openly, honestly, and at arm’s length with the officer, resorting to no devices to prevent a free competition by others.
Yery different from this was the case in 2 Wallace. There was no public bidding in that case. No contract was defined. The fee was contingent upon success. It was not a case of authorization to make a contract as agent, but an undertaking to compensate a party for procuring one to be made. This is the sense in which the court understood it, for they speak of it as a contract “ to procure favors in the shape of contracts,” and from its very nature “suggesting the use of sinister and corrupt means.” And the court, therefore, very propei’ly class it with agreements for “ lobbying ” legislative bodies, for “ procuring appointments to office,” and .the like. It was simply an agreement to pay a party for “personal solicitations and personal influences,” to be used in “ controlling the discretion of public officers,” and the court so denominate it. Such, also, was the construction put upon their contract by the parties themselves, for the measures employed for its fulfillment were properly denominated as mere “lobbying” and “solicitations for personal favors.”
On the contrary, it seems to us that the contract in the present case, as well as the means by which it was executed, were in no sense illegal or in conflict with the public interest, and that the court did not err in so holding.

Judgment affirmed.

Day, C. J., and Brinkerhoff, Scott, and White, JJ., concurred.